UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CARI LOUISE HOTTENSTEIN,

    Plaintiff,

    v.                                                     Case No. 23-CV-355-SCD

SINGLE SOURCE TRANSPORTATION OF
HARTFORD, LLC, ANTHONY JAMES KOEPPEL,
and STEFFANIE MICHELLE GEHL,

    Defendants.

---

DECISION AND ORDER
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

---

    Cari Louise Hottenstein formed a Wisconsin limited liability company called North American Dispatch, LLC (NAD). In 2005, NAD entered into an Agent Agreement with Single Source Transportation of Hartford, LLC (SST). Pursuant to the Agreement, Hottenstein performed freight dispatching for SST on behalf of NAD for approximately sixteen years. Anthony Koeppel worked as SST's General Manager for the majority of that time, and Steffanie Gehl took over the company upon Koppel's retirement. The Agreement classified NAD as an independent contractor, and SST compensated NAD accordingly for the duration of their engagement.

    After SST terminated the Agreement in 2022, Hottenstein filed the present lawsuit against SST, Koeppel, and Gehl. She alleges that SST misclassified her as an independent contractor rather than an employee, so the defendants now owe her unpaid overtime and minimum wages, in addition to wages that she claims SST impermissibly deducted from her

compensation for poor workmanship. The parties have each filed motions for summary judgment, but as explained herein, several factual disputes prevent resolution of most claims. I will grant summary judgment in favor of the defendants with respect to Hottenstein's alternative claim for unjust enrichment. I will deny the parties' motions in all other respects.

## BACKGROUND

SST is a freight broker and agent of the transportation company Landstar. ECF No. 33 ¶¶ 1, 10. SST and NAD entered into an Agent Agreement on August 19, 2005, whereby they agreed that NAD would perform freight dispatching services for SST as an independent contractor. *Id.* ¶ 6. Neither NAD nor Hottenstein was an agent of Landstar. *Id.* ¶ 47. From SST's inception through April 4, 2022, defendant Koeppel served as SST's General Manager, while defendant Gehl took over from that date forward. *Id.* ¶¶ 26, 28. Soon after, on July 26, 2022, SST terminated the Agent Agreement.

Hottenstein's dispatching services consisted of obtaining a load from a customer, locating a truck and driver that could move the load, entering the data for the shipment into Landstar's system, and ensuring that the transportation was successfully completed and billed correctly. *Id.* ¶¶ 8, 58. NAD/Hottenstein could not book other Landstar loads outside of SST. *Id.* ¶ 48. SST's other workers performed both dispatching and sales work, but Hottenstein did not engage in sales. *Id.* ¶¶ 52, 55. SST's primary source of revenue comes from dispatching freight. *Id.* ¶ 59. The parties agree that dispatchers do not need a specific education or license and can learn the work through on-the-job training. *Id.* ¶¶ 56, 57.

Hottenstein worked remotely from her home. *Id.* ¶ 9. Neither SST nor Hottenstein kept any records of the hours that Hottenstein worked. *Id.* ¶ 17. Pursuant to the Agent Agreement, SST calculated NAD's compensation as fifty percent of the commissions that SST received

from Landstar for the loads that Hottenstein dispatched. *Id.* ¶ 22. In March 2022, SST charged back $4,500 from NAD's commissions for Hottenstein's poor workmanship—namely, errors Hottenstein made on certain intra-Canadian rebilled loads. *Id.* ¶ 32; ECF No. 1 ¶ 84.

In March 2023, Hottenstein filed a complaint in federal district court against SST, Koeppel, and Gehl, alleging they violated state and federal law regarding minimum wage, overtime compensation, and payroll deductions. *See* ECF No. 1. The clerk randomly assigned the matter to me, and all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 8. On July 12, 2024, the defendants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* ECF No. 27. Hottenstein filed a brief in opposition, ECF No. 45, and the defendants filed a reply brief, ECF No. 48. Hottenstein also filed a motion for partial summary judgment on the same day as the defendants, *see* ECF No. 34. The defendants filed a brief in opposition to her motion, ECF No. 41, and Hottenstein filed a reply brief, ECF No. 50.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party is "entitled to a judgment as a matter of law" when "the nonmoving party has failed to make a sufficient showing on an essential element of [her] case with respect to which [she] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

3

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, I must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "However, [my] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." *Id.* (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

"On cross-motions for summary judgment, '[t]he ordinary standards for summary judgment remain unchanged.'" *Compton v. DuPage Cnty. Health Dep't*, 426 F. Supp. 3d 539, 542–43 (N.D. Ill. 2019) (quoting *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017)). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012).

## DISCUSSION

Hottenstein claims that SST failed to pay her state and federally mandated minimum wages and overtime compensation. ECF No. 38 at 7. She also asserts breach of contract and

4

Case 2:23-cv-00355-SCD      Filed 11/01/24      Page 4 of 20      Document 52

unjust enrichment, and she further contends that SST violated state law in taking a certain deduction from her compensation. *Id.* The defendants argue that Hottenstein worked as an independent contractor, and therefore is not entitled to the state and federal protections she invokes. ECF No. 28 at 7. The defendants also maintain that SST's agency contract with NAD resolves the claims for breach of contract and unjust enrichment but acknowledge that a factual dispute may remain regarding the statutory implications of the payroll deduction. *Id.* at 14–15; ECF No. 49 at 13–14.

## I. Federal & State Protections: Employee vs. Independent Contractor

The Fair Labor Standards Act (FLSA) sets forth federal minimum wage and overtime requirements. 29 U.S.C. §§ 206(a), 207(a)(1). "It is undisputed that the provisions of the FLSA do not apply unless there is a valid employer-employee relationship." *Bulaj v. Wilmette Real Estate & Mgmt. Co.*, No. 09–C–6263, 2010 WL 4237851 at *4 (N.D. Ill. Oct. 21, 2010) (citing *Sec. of Labor v. Lauritzen*, 835 F.2d 1529, 1534–35 (7th Cir. 1987)). For better or worse, the FLSA broadly defines the relevant terms in a circular fashion, i.e., *employer* "includes any person acting directly or indirectly in the interest of an employer in relation to an employee," *employee* means "any individual employed by an employer," and *employ* "includes to suffer or permit to work." 29 U.S.C. § 203(d), (e)(1), (g). Despite this breadth, federal regulations decisively exclude independent contractors from the FLSA's employee protections. *See* 29 C.F.R. § 795.105(a); *Solis v. Int'l Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 749 (N.D. Ill. 2011).

"A worker is an independent contractor, as distinguished from an 'employee' under the Act, if the worker is, as a matter of economic reality, in business for themself." 29 C.F.R. § 795.105(b). Courts in the Seventh Circuit utilize the six *Lauritzen* factors to determine

5

whether "economic reality" indicates that a worker is an employee. *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 665 (7th Cir. 2022). The *Lauritzen* factors are:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* (citing *Lauritzen*, 835 F.2d at 1535).[1] While the underlying factors are highly fact dependent, the ultimate "determination of a worker's status [as an employee or independent contractor] is a legal rather than a factual issue." *Harper v. Wilson*, 302 F. Supp. 2d 873, 878 (N.D. Ill. 2004). "No single factor is necessarily controlling—the ultimate conclusion on employee status is made by examining the totality of the circumstances." *Brant*, 43 F.4th at 665. Here, this analysis must consider the degree to which Hottenstein was dependent on SST, "with greater dependence weighing in favor of an employer-employee relationship." *See id.*

   A.  Nature and Degree of Control

The first factor considers the extent of the employer's control over the work in question. "If the employer oversees the 'manner and method' of how the alleged employees are to perform their work, they are probably employees rather than independent contractors." *Solis*, 819 F. Supp. 2d at 750. "One way to understand this factor is to ask whether the worker

---

[1] The parties agree that the *Lauritzen* economic reality factors are controlling over both the FLSA and Wisconsin law claims for unpaid overtime and minimum wages. ECF No. 50 at 3.

6

has control over such a meaningful portion of [her] labor that [she] operates as a separate economic entity, i.e., as an independent contractor." *Brant*, 43 F.4th at 666. "Facts relevant to the potential employer's control over the worker include whether the potential employer sets the worker's schedule, supervises the performance of the work, or explicitly limits the worker's ability to work for others." 29 C.F.R. § 795.110(b)(4).

In this case, Hottenstein worked remotely from her home, and neither Hottenstein nor SST kept records of the hours that she worked. ECF No. 33 ¶¶ 9–17. The parties' perspectives diverge from there. The defendants insist that SST did not require Hottenstein to work any particular days or hours, did not supervise her work, and did not prohibit NAD from seeking outside work. ECF No. 29 ¶¶ 15, 17, 19.

Hottenstein claims that she had to work from 7:00 AM to 4:30 PM each workday, with additional time in the evenings and on weekdays, because she had to be available by phone and/or email in case SST or a driver needed information. ECF No. 37 ¶¶ 3–4, 31. She declares that she limited daily breaks to twenty-five minutes. *Id.* ¶¶ 5–6. She maintains these demands meant that she did not have time for other employment. *Id.* ¶ 31. Even if she had the time, Hottenstein claims that SST precluded her from working as a dispatcher for other companies—because SST required her to comply with Landstar's policies and Landstar did not permit additional agent relationships. *Id.* ¶¶ 23–24, 34–35. Hottenstein also alleges that SST supervised her performance, such as by coaching her when ratings were low and instructing her which apps to use or conference calls to attend. *Id.* ¶ 26–28.

The parties provided a copy of the Agent Agreement between SST and NAD, which does not address whether NAD or Hottenstein could engage in outside work. *See* ECF No. 30-1, 31-1. During his deposition, Koppel stated that SST had to ensure compliance with

Landstar's policies and procedures and that Landstar "frowned" on taking work for other companies very much. ECF No. 30-12 at 15:5–22. Koppel indicated that Landstar would give an "us-or-them" ultimatum in that situation because Landstar wanted exclusive agent rights. *Id.* at 15:24–16:1. Koppel also opined that it was "highly, highly, highly unlikely" that Hottenstein ever worked forty hours in one week—based on his experience in the industry and modeling off another worker's revenue. *Id.* at 123:16–25; *see also* ECF No. 33 ¶¶ 62–190 (stipulated facts reflecting that Hottenstein earned weekly commissions varying from zero to upwards of twenty thousand dollars). Koppel claimed that Hottenstein was never available when SST or Landstar called and that Hottenstein would call back two hours later explaining that she was working with farm animals outside or had to run into town. *Id.* at 124:1–9.

Ultimately, these conflicting declarations about Hottenstein's work hours require a credibility determination that I cannot make at this stage of the proceedings.[2] That determination is an important consideration because it helps inform whether SST set Hottenstein's schedule and whether Hottenstein could engage in other dispatching work. Koeppel's explanation regarding Landstar's exclusive agent practices also touches on a factual dispute that cuts both ways. ECF No. 30-12 at 15:24–16:1. After all, Hottenstein claims she was not *allowed* to engage in other dispatch work, but she does not explain—by declaration or other evidence—how this understanding arose. *See* ECF No. 35 ¶ 10. Koppel lends some

---

[2] Hottenstein claims that the *Mt. Clemens* framework should apply to her accounting of work hours because SST failed to maintain time records. ECF No. 45 at 22 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Under that framework, an employee's recollection of work hours is sufficient to shift the burden "to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens*, 328 U.S. at 687–88; *see also Melton v. Tippecanoe Cty.*, 838 F.3d 814, 819 (7th Cir. 2016). This burden-shifting framework is premature however because it applies to the calculation of damages once an employee establishes an overtime or minimum wage violation. Here, the hours worked is relative to whether Hottenstein was an employee eligible for overtime and minimum wage protections.

8

Case 2:23-cv-00355-SCD    Filed 11/01/24    Page 8 of 20    Document 52

credence to Hottenstein's claim though, as he acknowledged that it was "frowned" upon for SST to take other work. *See* ECF No. 30-12 at 15:5–22. Despite this acknowledgement, Koppel claimed that SST did not prohibit NAD from engaging in outside dispatch work. *See* ECF No. 31 ¶ 13; *but see* ECF No. 33 ¶ 38 (the parties' stipulated facts reflect that SST's employees and independent contractors were expected to meet Landstar's "standards or requirements"). For these reasons, I find a genuine dispute of material fact as to the level to which SST controlled Hottenstein's work.

B. *Opportunity for Profit or Loss*

The second factor considers the degree to which Hottenstein's opportunity for profit or loss depended upon her managerial skill. *See Brant*, 43 F.4th at 668. Relevant facts may include:

> whether the worker determines or can meaningfully negotiate the charge or pay for the work provided; whether the worker accepts or declines jobs or chooses the order and/or time in which the jobs are performed; whether the worker engages in marketing, advertising, or other efforts to expand their business or secure more work; and whether the worker makes decisions to hire others, purchase materials and equipment, and/or rent space.

29 C.F.R. § 795.110(b)(1).

In *Brant v. Schneider National, Inc.*, the Seventh Circuit considered that the plaintiff—a truck driver—had the contractual ability to choose shipments and drive for other carriers but found that the complaint alleged a relationship in which the plaintiff "could not, as a practical matter, carry loads for anyone other than [the defendant]" and "had no realistic option other than to take the shipments that [the defendant] offered, even when they were unprofitable." *Brant*, 43 F.4th at 670 (evaluating *Lauritzen* factors at the motion to dismiss stage). This aspect of the profit-or-loss factor dovetails with the control-related observations noted above, specifically that Hottenstein has alleged she was unable to increase her earning capacity—

9

either by taking on additional loads from SST or securing outside work—due to the demanding hours and agency policies. ECF No. 37 ¶¶ 23–24, 31, 34–35.

While Koeppel declared that Hottenstein could accept or reject loads at her discretion, Hottenstein claims that SST assigned her limited lanes and loads to cover. ECF No. 31 ¶ 15; ECF No. 46 at 11–12. SST counters that Koeppel's deposition testimony was taken out of context and denies that it restricted Hottenstein's ability to bid. ECF No. 49 ¶ 9. The Agent Agreement between NAD and SST required Hottenstein to obtain prior approval for all pricing proposals and rate quotes, which necessarily limited Hottenstein's ability to set her own prices on her commission-based work. *See* ECF No. 33 ¶ 41; ECF No. 30-1 ¶ 3; *see also* ECF No. 41 at 4 (defendants arguing that SST did not limit rates on *all* loads on which Hottenstein worked). At the same time, SST maintains that Hottenstein could have engaged in sales efforts like the other workers based in SST's physical office if she wanted to increase profits. *See* ECF No. 33 ¶¶ 52, 55; ECF No. 49 ¶ 27. SST also asserts that Hottenstein could have renegotiated the Agent Agreement. ECF No. 48 at 6. But at least some circuits have found that sort of hypothetical potential is irrelevant to the economic realities test. *See Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 833 (5th Cir. 2020) ("We also find it irrelevant to the opportunity for profit or loss inquiry that the pipe welders could hypothetically negotiate their rate of pay because, under the economic realities test, 'it is not what the [putative employees] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.'" (citation omitted)); *see also Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 142 (2d Cir. 2017).

These facts present a mixed bag. SST did sometimes limit the rates that Hottenstein could charge, but it has generated a factual dispute as to whether it limited Hottenstein's

10

account bidding. ECF No. 49 ¶ 9; ECF No. 30-12 at 84:3–13. Koppel shared statistics from a former SST employee who garnered significantly more revenue despite working fewer hours than Hottenstein. *See* ECF No. 51 ¶ 4–7. This suggests that Hottenstein could have had greater influence over her earning capacity and but it also calls into question whether the alleged limitation in customer accounts could have hindered Hottenstein. Given these factual uncertainties, I cannot determine which party this factor benefits.

### C. Alleged Employee's Investment

"This factor considers whether any investments by a worker are capital or entrepreneurial in nature." 29 C.F.R. § 795.110(b)(2). Investments indicative of contractor status include "large expenditures, such as risk capital, capital investments, and not negligible items or labor itself." *Lauritzen*, 835 F.2d at 1537 (quoting *Donovan v. Gillmor*, 535 F. Supp. 154, 161 (N.D. Ohio)).

Hottenstein maintains that she made only the minimum investment necessary to perform her work. ECF No. 45 at 4. Hottenstein identifies her minimal investments as: half of her phone and internet costs (which were split with SST) and the cost of a replacement computer and printer. *Id.* The defendants point out that, according to her deposition testimony and tax returns, Hottenstein also invested in vehicle expenses, legal and professional counsel on matters entailing the business and taxes, office repairs, and other expenses related to her office, insurance, and travel. ECF No. 41 at 4–5.

Hottenstein acknowledges that she deducted $81,258 in expenses from her taxes over a five-year span. ECF No. 50 at 8. Hottenstein further admits that she received business loans through the Paycheck Protection Program (PPP) for $14,400 and $3,222—both of which the government forgave in full. ECF No. 46 ¶¶ 38, 46–47. She attempts to minimize this conduct

11

by comparing the figures to SST's significantly greater business expenses. ECF No. 45 at 17–18. But this argument is unavailing here; it is only logical that an individual worker would have fewer business expenses than an entity with employees doing the same work, not to mention that the dispatching itself does not appear to require much equipment or materials. *See Leffler v. Creative Health Servs., Inc.*, No. CV 16-1443, 2017 WL 4347610, at *5 (E.D. Pa. Sept. 29, 2017) ("While this factor is not significant given the fact that mental health therapy is not a profession requiring 'equipment and materials,' to the extent it is relevant, it too weighs in favor of independent contractor status."). The volume of SST's business expenses does not negate the significance of Hottenstein's apparent investment. *See Karlson v. Action Process Serv. & Priv. Investigations, LLC*, 860 F.3d 1089, 1096 (8th Cir. 2017) (observing that a comparison between the plaintiff's and defendant's tax-deducted business expenses had "little relevance" to the employee vs. independent contractor question); *Gray v. Killick Grp., LLC*, 113 F.4th 543, 550 (5th Cir. 2024) (finding worker's investment in costly certifications and equipment supported independent contractor status despite employer's comparatively more significant investment).

Hottenstein's tax-deducted expenses are not only significant in and of themselves but are the types which one might expect from someone who is, as a matter of economic reality, in business for herself. *See Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 966 (7th Cir. 2018) (recognizing that business expenses itemized for tax purposes may support investment consistent with independent contractor status). An employee worker is not typically responsible for her own office repairs, business-related legal counsel, and insurance. Plus, Hottenstein invested in half of the phone and internet costs at the heart of her work with SST. The significance of this investment may be lessened given the nature of Hottenstein's home-

12

based employment, although the parties have not revealed whether Hottenstein utilized those utilities personally. The parties have also not addressed the elephant in the room: that nothing in the record suggests Hottenstein's job should have involved significant vehicle or travel expenses.[3] This makes it difficult to place much weight on the alleged expenses—after all, the FLSA is concerned with the economic realities of the parties' actual practices without respect for how the parties *described* their relationship contractually or to the government. *See Brant*, 43 F.4th at 662 (noting that "what matters is the economic reality of the working relationship, not necessarily the terms of a written contract"). That being said, the undisputed tax-reported expenses suggest investment more consistent with an independent contractor than an employee.

D. Special Skill

The next factor "considers whether the worker uses specialized skills to perform the work and whether those skills contribute to business-like initiative." 29 C.F.R. § 795.110(b)(6). While SST acknowledges that Hottenstein needed "essentially the same" skills to perform dispatching services as SST's employees, it asserts that Hottenstein used specialized skills from her extensive experience in the industry. ECF No. 28 at 12. But a worker's improvement based simply on time-in-grade does not indicate a heightened skill level suggestive of an independent contractor status. *See Lauritzen*, 835 F.2d at 1537 ("Although a worker must develop some specialized skill in order to recognize which pickles to pick when, this development of occupational skills is no different from what any good employee in any line of work must do.").

---

[3] Hottenstein vaguely mentioned during her deposition that she had to drive to get supplies like paper or others related to her computer. ECF No. 36-1 at 51:4–12.

13

SST also claims that Hottenstein demonstrated business-like initiative by (1) pursuing legal and tax advice and (2) managing her own remote work operations. ECF No. 41 at 12–13. Even so, these run-of-the-mill activities do not demonstrate a heightened level of skill. If Hottenstein procured professional advice, it suggests that she did not possess that skillset herself, and it's now commonplace for modern workers to navigate a remote or hybrid work environment. Given Hottenstein's lack of specialized skills, this factor favors an employee relationship.

### E. Permanency and Duration

This "factor weighs in favor of the worker being an employee when the work relationship is indefinite in duration, continuous, or exclusive of work for other employers." 29 C.F.R. § 795.110(b)(3). Hottenstein argues that her sixteen years of dispatch work for SST weighs heavily in favor of an employee relationship. *See* ECF No. 38 at 25; ECF No. 33 ¶ 58. SST emphasizes its positions that Hottenstein chose which loads she wanted to move, SST did not require her to work any particular schedule, and Hottenstein likely never worked forty hours per week. ECF No. 28 at 13. These daily characteristics do not diminish the lengthy, continuous, and undisputedly exclusive working relationship between Hottenstein and SST. Accordingly, this factor also supports an employer-employee relationship.

### F. Integral Part of Alleged Employer's Business

The final "factor considers whether the work performed is an integral part of the potential employer's business." 29 C.F.R. § 795.110(b)(5). SST does not dispute that the dispatching work Hottenstein performed was part of SST's core work. ECF No. 28 at 13. Therefore, this factor also supports an employer-employee relationship.

### G. Totality of the Circumstances

Social welfare legislation like the FLSA compels "broad and comprehensive" coverage "to accomplish the remedial purposes of the Act." *Lauritzen*, 835 F.2d at 1534; *see also Simpkins*, 893 F.3d at 964 (observing that courts must "construe the terms 'employee' and 'employer' expansively under the FLSA" (citation omitted)). Therefore, I must consider the totality of the circumstances under the economic realities test "notwithstanding the existence of contracts purporting to define the relationship" as one between an independent contractor and her client. *Brown v. Club Assist Rd. Serv. U.S., Inc.*, No. 12 CV 5710, 2013 WL 5304100, at *5 (N.D. Ill. Sept. 19, 2013); *see also Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) (noting that employee status under the FLSA "depends on the totality of circumstances rather than on any technical label").

In this case, several factors from the economic reality test are suggestive of an employer-employee relationship, including Hottenstein's lack of special skills, the permanency and duration of the working relationship, and the integral nature of Hottenstein's work to SST's business. On the other hand, Hottenstein's apparent investment in her company, as evidenced by her tax returns, implies that she operated as an independent contractor. The defendants further note that Hottenstein could have dispatched for other companies and that she earned low commissions because she opted to work minimal and varying hours in comparison to full-time SST employees. ECF No. 28 at 7–8, 13. Ultimately, these factual disputes preclude my ruling either way on the claims. *See, e.g.*, *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) ("The court may not weigh the evidence or decide which testimony is more credible."); *see also Mendiola v. Howley*, No. 18 C 8536, 2021 WL 3033613, at *6–7 (N.D. Ill. July 19, 2021) (denying summary judgment where there was "a material fact dispute over whether Plaintiffs were free to work for other companies while doing work for

15

[defendants]"). Therefore, I must deny both parties' motions for summary judgment on Hottenstein's overtime and minimum wage claims.

## II.     Personal Liability

Hottenstein alleges that Koeppel and Gehl are personally liable for SST's alleged violations of the FLSA and Wisconsin law. ECF No. 38 at 30–32. The defendants do not confront the question of personal liability in any of their summary judgment materials. "However, a nonmovant's failure to respond to a summary judgment motion, or failure to comply with [the Local Rules], does not, of course, automatically result in judgment for the movant." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (citing *Reales v. Consol. Rail Corp.*, 84 F.3d 993, 997 (7th Cir. 1996)).

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Solis*, 819 F. Supp. 2d at 748. "Courts have found that a determination of whether an individual is liable under the FLSA depends not upon whether the individual controlled every aspect of the employees' conduct, but upon whether the individual had control over the alleged FLSA violation." *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 785 (N.D. Ill. 2011).

Here, Koeppel and Gehl, respectively, served as SST's General Manager during Hottenstein's tenure with the company. ECF No. 33 ¶¶ 26, 29. In this role, Koppel "was in charge of Human Resources decisions, had the ability to hire and fire employees, change employee rates of compensation, enter into or amend agreements with independent contractors, and begin to start paying employees overtime compensation." *Id.* ¶ 28. "Gehl had ultimate authority over every operation at [SST] except to the extent SST's operations were

limited by Landstar's rules and regulations." *Id.* ¶ 30. Gehl was also "in charge of SST's policies, practices, human resources, and had the ability to hire and fire employees, set the rates of pay for employees, and enter into contracts with independent contractors." *Id.* ¶ 31. These stipulated facts reflect that Koeppel and Gehl held extensive control over SST's employment and compensation practices. Therefore, they should be considered "employers" who are liable for any unpaid overtime or minimum wages under the FLSA, and in turn, under the analogous Wisconsin labor protections. *See* 29 U.S.C. § 203(d); *Solis*, 819 F. Supp. 2d at 749 (finding operational control and direct involvement with pay and employment practices rendered individuals "employers" under the FLSA).

### III. Billing Deduction: Statutory and Contractual Ramifications

Hottenstein alleges multiple theories of recovery in connection with SST's $4,500 deduction from her 2022 compensation. ECF No. 1 ¶¶ 78–101. First, she argues that the deduction violated Wisconsin Statute § 103.455. *Id.* ¶¶ 78–88. Second, she contends that the deduction breached her contract with SST. *Id.* ¶¶ 89–96. Alternatively, she contends that the deduction constituted unjust enrichment if no contract lawfully existed between SST and herself. *Id.* ¶¶ 97–101; ECF No. 45 at 26–27.

Wisconsin Statute § 103.455 prohibits an employer from deducting an employee's wages "for defective or faulty workmanship, lost or stolen property or damage to property" unless the employee authorizes the deduction in writing.[4] Pivotally, the statute only applies to an employee "who is not an independent contractor." Wis. Stat. § 103.455. State employment law defines an "employee" as "any person employed by an employer, except that 'employee'

---

[4] A finding of negligence, carelessness, or willful and intentional conduct may also suffice, but no party raises that argument. *See* Wis. Stat. § 103.455.

does not include . . . a member or manager of a limited liability company . . . or a person employed in a . . . commissioned sales capacity." Wis. Stat. § 109.01(1r). The parties have not offered evidence confirming Hottenstein's apparent membership and management of NAD, nor regarding the consequences of NAD's dissolution. They also have not explained their positions regarding the applicability of a "commissioned sales capacity" to describe Hottenstein's work. For these reasons, I find that Hottenstein has failed to establish the applicability of this statutory claim, while the defendants have failed to prove its inapplicability. Ultimately, genuine disputes of material fact prevent resolution of Hottenstein's statutory claim.

As for the breach of contract theory of recovery, Hottenstein asserts that an implied contract existed between SST and herself (as an individual). ECF No. 45 at 25–27. She claims the implied contract arose because the parties continued to operate based on the terms of the Agent Agreement between SST and NAD—without entering into their own contract after the government administratively dissolved NAD. *See id.* The defendants maintain that the parties operated pursuant to the express terms of the Agent Agreement for the entirety of the relevant time period. ECF No. 49 at 13–14. Therefore, according to either party, the terms of the Agent Agreement should control Hottenstein's claim for wrongful deduction.

The parties agree the claim cannot be resolved at this stage because they dispute whether Koeppel and Hottenstein agreed to the deduction under the terms of the Agent Agreement. Section five of the Agreement provides: "The AGENT and [SST] will assume all the costs of conducting agency operations hereunder unless case-by-case arrangements are agreed upon between AGENT and [SST]." ECF No. 30-1 at 2. The defendants argue that the parties' agreement fell within that case-by-case provision. ECF No. 28 at 14–15. Koeppel

18

declared that he and Hottenstein extensively discussed the precipitating events and came to an agreement about the $4,500 deduction, confirmed via phone and email. ECF No. 30-12 at 62:23–66:21. For her part, Hottenstein stated during her deposition that she did not consent to the deduction. ECF No. 36-1 at 61:2–23. This factual dispute requires a credibility determination that is inappropriate for this stage of the proceedings. Consequently, summary judgment cannot be granted.

As for Hottenstein's claim for unjust enrichment, Hottenstein concedes this claim is not viable so long as the parties agree that a contract governs their dispute. ECF No. 45 at 26. The parties do not agree as to the express or implied nature of the contract but concur that they operated pursuant to the terms of the Agent Agreement. ECF Nos. 33 ¶¶ 6, 8, 29; 45 at 26; 48 at 13–14. Wisconsin law is clear that "[t]he doctrine of unjust enrichment does not apply where the parties have entered into a contract." *Cont'l Cas. Co. v. Wisconsin Patients Comp. Fund*, 473 N.W.2d 584, 587 (Wis. Ct. App. 1981) (citing *Watts v. Watts*, 405 N.W.2d 303, 313 (Wis. 1987)). On this record, the Agent Agreement clearly governed the terms of the parties' engagement—regardless of whether it operated expressly or impliedly. Therefore, I find the defendants are entitled to summary judgment on the unjust enrichment claim.

## CONCLUSION

For all the foregoing reasons, the court **DENIES** the plaintiff's motion for summary judgment, ECF No. 34. The court **GRANTS IN PART** and **DENIES IN PART** the defendant's motion for summary judgment, ECF No. 27. The defendants are entitled to judgment as a matter of law on Hottenstein's claim for unjust enrichment. Factual disputes prevent resolution of all other claims. The clerk of court shall schedule a status conference to discuss how the case will proceed from here.

19

**SO ORDERED** this 1st day of November, 2024.

_____
STEPHEN C. DRIES
United States Magistrate Judge